We're going to call the next case. Here is the letter. You spot both attorneys would step up and identify yourself to the records. You will have approximately 15 minutes for your argument and from that Ms. Mason you may save out some time. Reba? Yes, thank you. Your Honor, I would request that time for rebuttal. Yes, you will have it. May it please the Court. This case is about two substantial violations of the Sixth Amendment. The first has to do with the trial court's denial of Mr. Perkins' unequivocal request to proceed pro se at trial. And the second has to do with various Confrontation Clause violations that occurred when statements made by the decedent were admitted absent cross-examination at trial. Each of these Sixth Amendment violations requires this Court to vacate Mr. Perkins' conviction and remand for a new trial. First with regards to the self-representation issue. All that is required for an individual to assert his right to self-representation is that he make a clear and unequivocal request to do so. Here Mr. Perkins told the trial court, I want to represent myself please. I have the constitutional right to represent myself in these proceedings. It doesn't get more clear and unequivocal than that. It doesn't have to be knowingly and intentionally made or intelligently made? That's the next step in the analysis. Once the clear and unequivocal statement is made, then the burden falls on the judge to determine whether the waiver of a right to counsel after Rule 403.1a admonishments are made is a knowing and intelligent waiver. Now there are three things that the waiver has to be knowing and intelligent about. First, the defendant needs to understand the nature of the charges against him. Second, the range of punishment, including whether sentences could be run consecutively or whether there's any enhancements due to prior convictions. And third, that he had a right to an attorney, and if he cannot afford one, one will be appointed without charge. Here, the trial judge never asked any of those questions. Instead, the trial judge did what the Illinois Supreme Court has already decided is inappropriate. And he began to question Mr. Perkins about his knowledge of the intricacies of capital proceedings. So this was a death penalty case at the time. Mr. Perkins stated that he didn't want to discuss that, and that he wanted to assert his right to self-representation. He said he didn't know anything about it, right? He said, no, sir, I don't know anything about it. No, that's not actually what he said. He said, I don't want to talk about that now. And then reasserted his right, his expression that he wants to represent himself. Even if he doesn't know anything at all about capital representation, what goes on in a capital trial, it doesn't matter at that stage. At that time, he requested to represent himself. Was there some question about his fitness for trial? Not yet. Now, there had been some statements made by both defense counsel and the state regarding the fact that he may have some sort of mental health issues. And there had been exchanges of discovery in mental health records. But neither the trial court, nor defense counsel, nor the state, at that point had required that any sort of mental health examination to delineate the issue of competency be performed. And what's important to note is that in People v. Red, the Illinois Supreme Court held that the standard for competence to proceed pro se is the same as the standard for competence to stand trial. So if the trial court had had some sort of bona fide doubts as to Mr. Perkins' competence, then the trial court would have had to address those at that time not only for pro se purposes, but also just for simple competency to stand trial purposes. The trial court did not do that. Now, it's worth noting that a few months later, trial counsel finally requested that a BCX be done. And it was. Mr. Perkins was competent. After the judge said something about it being a capital case, then what did the defendant say? The defendant said, to get the exact quote, I'm not interested in that right now, Your Honor. Before he said I'm not interested in that, didn't he say no, sir? Do you know what's involved in that? He said no, sir. He may have. However, it doesn't matter. Why doesn't it matter? I mean, who's supposed to be in charge here? Is the court supposed to take any responsibility for what it does? I mean, he said no, sir, I'm not interested in that. Does the court get to step back and take a pause or not? I mean, the court certainly can try to teach him about what's involved in death penalty proceedings or ask him specific questions. All of those sorts of things are certainly within the court's options before it. But that's not what the trial court did here. The trial court just blanketly then refused the request. The judge did have some reason at this point to question the mental health of the defendant, right? I mean, it's a pretty drastic thing to let someone go pro se. I mean, the right to a lawyer is, you know, the lawyer protects all your other rights, and judges want to be very careful before they let someone go pro se. If you have some reason to believe, even if there hasn't been a BCX yet, that there might be some problems here, even if the judge just wanted to kick the can down the road a little bit, just to sort of, you know, let's make sure that this guy understands what he's doing. I mean, he's giving statements that indicate he doesn't even care what the sentence is, which would, I think, give somebody pause. Why don't you care what your sentence is? And he has independent reason to believe there's some mental problems. Wasn't the judge just trying to be responsible for this person a little bit? Well, to answer your first question, yes, the judge absolutely could delve into whether there are mental health concerns there. But to answer your second question, no, the judge can't just sort of step in and act almost as a guardian ad litem on behalf of the defendant and try to protect him from himself. Even in a death penalty case. I'm just saying, wasn't it in fact a death penalty case? Yes, at that time it was.  I don't really know anything about this or I don't care that it's a death penalty case. Are you saying there's some case out there that says the court must proceed at that moment and begin with the admonishments? Is there a case that says that? Yes. In People v. Coleman, the Illinois Supreme Court did hold that even in these death penalty cases that the defendant does have a right to proceed pro se, and that if he requests to do so, he absolutely should. Okay, but that's not really the question I asked you. But that combined with... We know without question that when we did have the death penalty, that a defendant had the absolute right to self-representation. So that wasn't really the question I asked you. I asked you if there was a case that you had that said when a defendant indicates to the court that they're not in any way concerned with the fact that it's a death penalty case, that the court then has an obligation at that juncture to begin admonishments. That was my question. There's not a case that specifically addresses the issue in that context. However, all of the cases that have addressed the specific standards for what a judge has to do in all cases, be it a death penalty case or an aggravated speeding case, the procedures are the same. The constitutional right to self-representation is the same, regardless of if the sentence is a day in jail or the ultimate sentence of the death penalty. Did the lawyer say anything then about the case not being ready and anything else? Yes, yes. The public defender who had been appointed at that time interjected, saying that he still had a lot of experts to talk to and that he wasn't going to be ready to try the case any time in the near future. Now, what's important to note, though... And the defendant demanded a trial that day, right? Yes. He said, I want a trial right now. Yes. Even though there's a discovery pending, even though it's a death penalty. He's not interested in whether it's a death penalty. He wants a trial today. Correct. Do you think the judge made the bad call then? Do you think the judge should have advised him and then, okay, we're going to trial? Would that have been the... Well, they're two separate questions. Intelligent or... The appropriate thing for the judge to have done would have been to do the admonishments and after fully admonishing Mr. Perkins, if Mr. Perkins still wanted to proceed, then if the judge had some sort of concerns about his mental health, then the next step... Well, they have just based on that sentence alone, I want a trial today on a death penalty case. That might have been a real good indicator right then and there, we've got a problem, because he wants to have a jury come in and hear a death penalty case today. So I think there might have been a real good indicator right then and there that there might have been a problem with the defendant's capacity. And that is the perfect reason to order an examination so that an expert can determine whether he has the capacity to proceed to trial, which is... And actually that happens some weeks later or months later? It was a few months later, but notably not at the court's order. It was the defense attorney's request. So this wasn't the judge saying, no, some of the things that Mr. Perkins has said, they're giving me concerns about his mental health, or some of the things that other people have told me give me concerns. Did he ever ask to represent himself again after that day? No, but the... Okay, I just wondered. No, but the... Later on, just in that proceeding alone, Mr. Perkins did try to speak up again. We don't know about what. We do know that he was raising his hands, and the judge specifically told him to put his hands down, that he wasn't going to talk to him anymore. Then a couple of months later, Mr. Perkins filed another speedy trial request, and the judge was very explicit with him that, Mr. Perkins, you have a lawyer. I do not want to address any more pro se issues from you. I will not address any more pro se requests from you. Quit filing them. So at that point, Mr. Perkins had been repeatedly told, don't talk to me without your lawyer, through the judge. So he didn't really, absent of risking a contempt charge, have any other opportunity. He had already gotten a ruling from the judge on his request to proceed pro se, so he didn't really need to keep asking and keep asking. So he never did ask again, and even that day he didn't say, I'd like to represent myself. I want to file these motions because I want to represent myself. Did he say that? The day. The day. The day. The day. The original day. Months later, when he said, I don't want any more of these pro se motions from you. No, he did not. He did not say anything regarding his right to self-representation at that time. It was only the one day in September of 2009 when he brought up self-representation. He made two separate requests on that date. Now, trial court, if it had concerns about competency, absolutely should have gotten an examination done, but didn't make that choice. Jumped over any sort of inquiry into whether this was a knowing and intelligent waiver, and instead just, you're done. I'm going to deny your request because of what you told me about not caring about the death penalty. That just doesn't comply with the standards that have been set out by the U.S. Supreme Court or by the Missouri Supreme Court. So because of that, we have a structural error. Since this is a structural error, Mr. Perkins is entitled to a new trial and should receive that trial. Okay, how about the really meaty issue here today? Why don't you move on with that? Okay, so we have basically three statements that came in from the decedent that she made to various police officers after she was shot but before her death. There are three arguments that the state made that these statements should come in. They did it in different ways at trial versus on appeal, but they basically argued that the statements were excited utterances, that they were dumb declarations, and that they come in under forfeiture by wrongdoing. None of these apply. First, very briefly on excited utterance, there's no dispute here that these were testimonial statements that they were made to the police as part of police questioning when the police officers were investigating the crime as opposed to trying to get her emergency assistance. So excited utterance flies out the window there because excited utterance is not an exception to the confrontation clause. That leaves us with dying declaration and forfeiture by wrongdoing. None of these statements are dying declarations. In order for a statement to be a dying declaration, the state has to prove beyond a reasonable doubt that the declarant had a fixed belief that her death was imminent at the time she made the statements. Does that have to come in by words of hers or can another method work? Other methods can work. For example, if there is evidence that if a nurse or a doctor were to come in and say, yes, I told her that she was going to die very soon, that there were no chances of life. Wasn't she shot in the face and didn't they have to stop that police officer from talking to her because they needed to attend to her immediately? She was shot in the face. In terms of the medical treatment that needed to be pursued at that time, there's not a whole lot in the record about that. Yes, we do know she was shot in the face. She was shot in the face. Okay, so minor kind of treatment, you think? Well, when we think shot in the face, we automatically think brain damage, bullet in the brain. That's not what we have here. Although there's very little, whatever it was, it killed her eventually, didn't it? It killed her eight days later. It did kill her eventually. It did, right? It was the shot in the face that killed her. Eventually, yes. Eight days later. But we don't know that her death was imminent at that time. We don't know how she actually ultimately died, if it was from an infection. And she did die immediately. There's no question. Correct. Eight days. Correct. All right. So we have this situation where the police officers are talking to her, but the only evidence that they argue that she had any belief that her death was imminent is she was shot in the face. That's simply not good enough to prove dying declaration. 1963, People v. Baird, the Illinois Supreme Court said, guy was shot in the face. That evidence alone, not enough. So, hey. Forfeiture by wrongdoing. Forfeiture by wrongdoing. Now, this one's a little bit muggy on the record, because the trial court was applying the statute that the Illinois Supreme Court was applying two different statutes. It's been repeated. Yes. The statute is out of the picture. So we're really just dealing with common law forfeiture by wrongdoing, which if this did fall under the doctrine of common law or of forfeiture by wrongdoing, it is an exception to Crawford. But in order for something to be forfeiture by wrongdoing. What did Justice Scalia tell us? Justice Scalia told us in Jiles v. California that the conduct must be designed to prevent the witness from testifying. All right. We don't have that here. Now, let me ask you about when you say we don't have it. Are you saying that it could never be used for the actual subsequent death as a result of this shooting? I'm saying that the evidence that the state presented at the hearing, no. It couldn't come in in this case with the evidence that the state presented. And are you set on that one, on that position? It could never come in on this case? Oh, could it come in in a murder case like this if there were evidence? If they were to establish that his intent was to stop her from testifying, does it matter whether it was from a prior case, from something that might come up in the future, or this particular offense itself? Honestly, that's unclear in the law. Okay. It's unclear. Yes, it's very unclear. Now, the case that the state relies on, the Hansen case, doesn't really answer the question one way or the other because it was very weak in that the defendant had threatened to kill his sister months before, weeks before, or something. Yes, because of the identity theft thing. And the identity thefts were charged right along with the murder. So we don't know if that was allowed because the identity thefts were there or not. But here, it doesn't really matter because we don't have the sort of evidence that he was involved in. But don't we have evidence here that there was a violation of an order of protection just by his very act that night, and there was a previous complaint or case involving, was it criminal damage or some kind of battery? Was it a battery? It was a property damage. Yes. And it was an SOL, stricken with leave to reinstate. So, yes, there's evidence of those two things. They had established that there was this intent to prevent her from testifying. Are you saying you can't go back to those incidents? No, I'm not saying that. All right. So they didn't establish any intent. Correct. And, therefore, it could not come in. Correct. And were the court to make such a finding that it could have come in? If that finding were supported by a preponderance of the evidence, yes. All right. Okay. But it wasn't done here. Correct. And the court kind of indicated that in his findings, didn't he? Absolutely. The court relied on a statute that doesn't apply to murder cases. The 6 versus the 7 statute. Yes. He was relying on the 7 and said, I don't even have to address whether there was intent here or not because they've proved to me by a preponderance of the evidence that he killed her. All right. So he never made that sort of finding. That sort of finding wasn't supported by the evidence in the record. There's three basic things there. They argued that in a murder case, it should always come in because, obviously, you're always killing the decedent in the murder case and preventing them from testifying in a subsequent murder trial. Well, there's some sort of authority for that or reason for that position. I think there's, rationally, I can see why a person would want the law to be that, but that's not what the law is. But I thought we already decided it's a little murky. On that particular part, it's not all that murky because Justice Scalia did address that sort of situation in Giles where there's no evidence of intent to kill, where it's just a murder. And he said, specifically, in cases where the evidence suggested that the defendant had caused a person to be absent but had not done so to prevent the person from testifying, as is the typical murder case involving accusatorial statements by the victim, the testimony was excluded unless it was confronted or fell within the dying declaration exception. So this is not something that, back to before our Constitution existed, was allowed in under forfeiture by wrongdoing, so it wouldn't be a Crawford exception. Now, there's the two other issues, the order of protection. And in terms of the order of protection, the theory is that he violated the order of protection by showing up at the decedent's house that night. However, there are two important facts to remember. First, the decedent's statement that she gave to the detective where she's described what happened as Mr. Perkins coming from the alley, into the backyard, telling her, I told you what was going to happen. Wait a minute, he was at the front door before that. That's not what the decedent said. I thought that the son testified. That's what's interesting here, is the son and the decedent tell two very different stories. There's information in this record that suggests that he came to the front door and rang the bell, isn't there? Yes, but that brings us to the second fact. And that is that as soon as the police went to Mr. Perkins to arrest him and they started asking about what happened, he immediately admitted that he had spoken to the decedent and that he had seen the decedent that night. Okay, so didn't he just admit to the police that he violated the order of protection? He wasn't allowed to talk to her, be anywhere near her, or anything of the sort. Exactly, exactly, that's my point. He admitted to the police that he violated the order of protection. He certainly wasn't trying. He went over there and shot. No, he wasn't trying to cover up the violation of the order of protection, though. He explicitly confessed. Was he trying to cover up something else, then? We don't have any evidence that he was trying to cover up anything. Well, the son testified, he came to the house and rang the bell, then all of a sudden the son hears this thing that sounds like a bang or a gunshot or something, and then he goes outside and his mother's there dead. Or shot, I shouldn't say dead, she's shot. Yes, with there being the mother slamming the front door shut and running through the house in between that, yes. Okay. So there we have those facts, but those facts in and of themselves, while they may establish an order of protection, they don't establish that he was trying to prevent her from testifying about the violation of order of protection. And his subsequent actions refute that presumption. Now, there's also this issue of the property damage that happened well before the shooting. And in terms of the property damage, it's interesting to note that the decedent wasn't even home when this alleged property damage supposedly occurred. So she wouldn't have been able to testify against him in terms of him supposedly breaking his front door because he wasn't there. And it was the state that introduced that evidence through the testimony. Weren't there a few little boys that saw that? Yes. Okay. Are they not available witnesses or could they be available at some point in the future? They both testified in his trial. Okay. And the thing is, if he hadn't shot those boys and made those sort of statements about how he was shooting them to prevent them from testifying or there was evidence to support that, that would be one thing. What about when he walked out of the jail after the order of protection and the criminal damage charge? And didn't he say to somebody, I know what I have to do now? Did he say that? Yes. It was something right along those lines. All right. He absolutely did say that. I believe it was when he got arrested on the property damage charge. I thought it was when he posted the bond, but I must be mistaken. I think that they were basically at the same time. I don't think he spent a lot of time in jail on property damage. Okay. So basically the same day. And yes, he allegedly made those statements. And he also, you know, that combines with the statement that he, the decedent claims he made to her that he had told her what was going to happen. Now, those are bad statements. They make him look super guilty. I don't deny that. But they don't actually show that he had an intention to kill her to prevent her from testifying in the property damage. What they show is that at that time when he was arrested when he was released, he may have very well come up with the intent to kill her at that time. Because if that's what he was talking about then, if he was talking about killing her, then that sounds more like a punishment for having gotten him arrested than it does for preventing her from testifying, especially when we look at the facts that the case was off the call. She had already no show to court date. If what he wanted was for her to not testify, she complied with that completely by not showing up to court. So there's not, and absent that evidence, as awful as it is to have those statements and not be able to use them, as much as the state might like to use them, as easy as it might make their job, they just don't come in. The confrontation clause is too important. Without that proof that he was intentionally trying to prevent her from testifying, they haven't made their case. So the statements don't come in. That leads to the question of whether these statements were harmless beyond a reasonable doubt or not. And the state admitted at trial that they weren't. During rebuttal, the prosecutor said, what Elvin did not anticipate when he shot Teresa Iacovetti in the face was that she would live to tell anyone. Because at that point, if she had not lived to tell anyone, it's perfectly clear that then, yeah, we need all that DNA. We need all sorts of stuff to try to figure out who was there and who did it. But we don't really decide this case on some kind of closing argument, do we? Well, not exclusively, but it shows how weak the state's case was here. If we get rid of the statements from the decedent, you know, the eyewitness to the case from the elder. We can get a circumstantial case without the statements, but that doesn't mean it's really weak. He was there. He was there, wasn't he? The son put him at the front door. He testified about, he told the police officers that he had spoken to her. And what else did he say? That he had spoken to her and he had seen her. And that was like an hour before? So wasn't that right around the time of this shooting? Yes. All right. And then you have her going, her shutting the door, going to the back, and then she's shot. Okay? So and then what's the other thing? Oh, the gunshot residue. All right. So it's a circumstantial case. Whether that's enough without the statements, I don't know. But it certainly, it could be. But the question is really whether if you take those out, is there an indication that a jury might not have convicted him? And that's exactly what we have here. Well, it may have been sufficient for a jury to convict. There's a good chance that those statements nailed it all shut. Exactly. That's what the prosecutor was seeking to do. That was the state's trial strategy, and it was successful here. Absent statements, there's a very real possibility of a different outcome at trial. That's why it's not harmless beyond a reasonable doubt. And Mr. Perkins should have his conviction vacated and his case remanded for a new trial. All right, Ms. Mason. Thank you so much. We'll give you some time for rebuttal. Ms. Mahoney. Good morning. Good morning. Again, Janet Mahoney on behalf of the people of the State of Illinois. I'm going to briefly touch on the right to self-representation, and this court is to review the trial court's ruling with deference. And what is it that the trial court knew at the time that he ruled upon this motion? And that is a defense counsel who came into court and tendered some discovery on his own client with a mental health history a jacket a mile long, a representation by the state's attorney indicating to the court that the defendant was schizophrenic, no denial by the defense counsel, a question about whether he was on medications and what those medications were, where the defense counsel said he was on medication but everybody agreed there was a question about his mental health and it needed to be evaluated. Now, on the day that the defendant made his request to go pro se, the court asked the defense counsel about what's going on in the case because the defense was investigating the possibility of an insanity defense. And what the defense counsel stated was that there were four experts and they hadn't received any of the information back from those experts yet. Now, there had not been a behavior clinical examination as of this point yet. Why? Because the defense is investigating their own insanity defense. And it wasn't until they had decided that that they then asked for that examination. So on the day that the defendant made this request, there had been no fitness hearing. The other thing that's really important to make clear about this issue is that even if you're fit for trial with the assistance of counsel, it does not mean that you're fit to proceed pro se. And there's an overriding interest in a courtroom on behalf of everyone in there, defense, the state, and the court, to make sure that the defendant receives a fair trial. And if a defendant is mentally ill, he is incapable of representing himself. And that would be a huge violation. If this court had granted the motion on the day it was requested, we would be here on a completely different issue that would be really hard to justify, given the information the trial court had when it made the ruling on this motion. On to the evidentiary issues. It's important to remind you that the standard of review here, again, is with deference for an abuse of discretion. And this court, because it's a pretrial ruling on a motion, can look at the entire record to affirm that ruling on any basis it would like. It is the state's position that these statements were dying declarations and that you can look at the nature of the wounds sustained by the victim to determine whether it was a dying declaration. You don't need an overt statement from the victim to someone else or a statement from someone else to the victim stating that they were dying. Is an injury alone enough? Injury alone can be enough. And it's the subjective view of the person who has been shot. A person who was shot in the face, right here, and it travels through their brain, is going to believe they're dying, even if they're receiving medical treatment, is going to believe they're dying. And that's what makes her first statement to the first detective a dying declaration, because he's at the hospital and she's undergoing active treatment in the emergency trauma center. Second statement, 15 minutes later, she is still in the emergency room trauma center. While not undergoing active treatment at that time, she's still there. Death is still imminent. As for the final statement, hours later, while she's not in the trauma center and she's in a hospital room, that bullet is lodged in her brain near the base of her skull and isn't coming out. She believes death is imminent. That's what makes all three of these statements dying declarations. It is what she was thinking, and she had sustained a gunshot wound to the face where there was a lot of blood. Interject here. What case would you say best supports your position that they were all dying declarations because of the primary fact that she was shot in the face and that we can sort of assume her subjective belief was imminent death? What case would you urge us to review for that? I would look to the Lawson case that is cited by the state. I understand that there were more gunshot wounds in that case. He was shot nine times. But what's important in that case is that the court stated that being shot nine times with a powerful gun and you're bleeding, you believe that you're going to die. And simply because he had asked at the time that he was found in a ravine, I'm dying, help me get out of here, and the defense had argued, he said help me get out of here, and it meant he didn't mean he was dying. The court in that case rejected that notion saying, you know, simply because somebody, you know, says wants to seek treatment doesn't mean that they don't believe that they're dying. And if we were to find that, that anyone who had any kind of ray of hope that they're going to live meant that it wasn't a dying declaration, meant that there wouldn't be a dying declaration. How about the forfeiture by wrongdoing? With the forfeiture by wrongdoing, what the Giles case stated is that the state needed to prove that the defendant committed the act intending to prevent the witness from testifying. The issue in that Giles case was that the state had been proving that the defendant committed an intentional act and then the witness couldn't testify. So it said, wait, wait, wait, wait. You've got to prove that he intended the witness not to testify, and that's what was proven in this case. We start out with the criminal damage to property case. It's an ex-boyfriend. He breaks the window when the little kids are at the house. She calls the police. She files charges against him. The order of protection is put in place, and it's handed to him in court. Yes, you're right. She doesn't show up to court approximately two weeks before he shoots her, and the case is stricken with leaves to reinstate. But at the time that he was arrested for the criminal damage to property case, he stated to the arresting officer, I know what I am going to have to do when I get out. So it took him two weeks after that case was dismissed before he shows up at her front door, knocks on the door, and she goes to him. It's after midnight. And she slams the door on his face, locks it, and runs to the back door. But what does he know what she's done before when he broke the window to her house? She called the police. He was dragged into court. What does he do? He's shooting her at the back door when she's lying on the floor. Does it matter that the case was stricken with leave to reinstate? No, it doesn't. You do not have to have a pending case. You just have to know that she may shoot. You're thinking she's going to testify. And if he had not killed her in this case, she would have testified. What about the actual murder? Are you agreeing with counsel that you can't use these statements on the actual murder case itself? Absolutely not. You don't agree with her. I do not agree with her. And the Hanson case is really what describes it. So in Hanson, you have the identity theft and the threat, and then you have the murder, right? And the statement that came in between the siblings, like, you know, our brother is stealing from our parents, and he told me if I told him he was going to kill me, right? Yes. And it came in at the murder, the act that caused the unavailability. And that's really interesting to say that, oh, well, the identity theft case was attached to it, so therefore that would make it okay. Well, what defense attorney is going to keep those cases together if it wasn't admissible in the murder case? It's one of the pieces of evidence that proves the murder beyond a reasonable doubt. Those cases wouldn't have been tried together. That proves that these statements can come into the trial for the act that caused the unavailability. That's why the statement here comes in at this trial for the act that caused unavailability. Did the trial court during its ruling state that there's no need to find intent? Well, again, we're reviewing this. You can look at the entire record to affirm the ruling that the statements come in on any basis in the record. So at the end of the day, in terms of affirming a pretrial ruling, it's ultimately irrelevant what he thought. That's not what they did in Giles that sent it back, did it? Well, in Giles, what happened in Giles is that there was no evidence of intent there that had come out before the court. We have intent here. We know it because he said it. He said, I know what I'm going to have to do when I get out. But is that a decision that we should make on appeal, or should the trial court make that decision after hearing witnesses? Well, that's a very interesting question, because at the very most, this is a remand for hearing on that issue. It's not a reversing remand for a new trial. But there is enough evidence in the record for this court to find that he intended to prevent her from testifying against her at a trial. Against him. At a trial. Because we know that based on the past act of when he broke the window of the house, she called the police. The case was charged. And he said, I know what I'm going to have to do to her when I get out. He violates the order of protection. She slams the door in his face. He knows what's coming. He kills her. It's the state's position that this evidence is admissible via dying declaration for all three statements, and forfeiture by wrongdoing for all three statements. And at the very least, even if it was wrong, it is harmless beyond a reasonable doubt. This is enough evidence to convict the defendant beyond a reasonable doubt. We have the son who answers the door, places defendant at the house at midnight, says his mom locks the door, runs to the back, hears a crack goes out, his mom has a gunshot wound to the face. And the defendant is arrested shortly thereafter with gunshot residue on him. He had threatened, I know what I have to do to her when I get out. We have him placed at the scene. We have a motive. And we know that he's been firing or in the environment of a firearm based on the gunshot residue. So at the very least, this is harmless. Unless there are any other questions, we ask that you affirm the conviction and sentence. Thank you. Ms. Mason, brief rebuttal. Just to address a couple of points that the state made briefly, they urged the court to look to Lawson to determine whether this is a dying declaration. And this court absolutely should look at Lawson. And it should look at all of the facts of Lawson, one of which was that the decedent in Lawson repeatedly told the bystanders that he thought he was going to die. It was his injuries combined with those statements that proved that he had the belief that his death was imminent. Here, Behr replies, Behr is still good law over 50 years later. A gunshot to the face in and of itself is not enough. So that leaves us with forfeiture by wrongdoing. And the state hangs its hat on Hansen. Hansen was a very different case. We don't know what issues there were in terms of severance or joinder in Hansen and what decisions were made about what would be tried together or not, because that wasn't on appeal in Hansen. What was appeal on Hansen was the standards relating to when these sorts of statements come in. Hansen was a special case, and it was very different from this case. First, because the identity theft charges were charged with the murder in the same trial. But secondly, in Hansen, we had classic forfeiture by wrongdoing. We had a defendant explicitly threatening, if you tell on me for this crime you know I've committed, then I will kill you. Absolutely, that's forfeiture by wrongdoing. Here, we're left guessing what a very vague statement may or may not have meant. Is it possible? I don't really see it. I see it more of if he was talking about killing her when he made that statement, it was to punish her for getting him arrested, not to prevent her from testifying at some future hearing. But even if that is the case, we don't have evidence by a preponderance. The state didn't prove it by a preponderance of the evidence. And the trial court did not apply the proper standard. That's the dictionary definition of an abusive discretion, that the trial court did not apply the proper standard, and because of that, the trial included this evidence that simply should not have come in. For those reasons we asked, along with the reasons relating to the right to self-representation, that the conviction be vacated and that Mr. Perkins receive his new trial. All right. I want to let both attorneys know the case was extremely well-argued and well-briefed. We'll take it under advisory. Thank you. Okay.